IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Amy Sue Davidson,<br><br>          Plaintiff,<br><br>vs.<br><br>Michael J. Astrue, Commissioner of the<br>Social Security Administration,<br><br>          Defendant. | No. CV10-0012-PHX-NVW<br><br>**ORDER AND OPINION** |

Amy Sue Davidson seeks review under 42 U.S.C. § 405(g) of the Commissioner of Social Security's final decision denying disability benefits. The Court will uphold the Commissioner's decision.

**I.     Standard of Review**

The Court will uphold the Commissioner's final decision if it is supported by substantial evidence and not based on legal error. *See* 42 U.S.C. § 405(g); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir.1996). The substantial evidence standard requires the evidence, as a whole, to be "more than a mere scintilla but not necessarily a preponderance" and otherwise sufficient such that "a reasonable mind might accept [the evidence] as adequate to support a conclusion." *Tomassetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal quotation marks omitted). Further, if the "evidence is susceptible to more than one rational interpretation" and the ALJ's decision is supported by one such rational interpretation, the Court will affirm the ALJ. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).

1    The Court will review only the issues raised by the party challenging the ALJ's decision. *See Lewis v. Apfel*, 235 F.3d 503, 517 n.13 (9th Cir.2001). The Court will not reverse for harmless error, which exists "when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tomassetti*, 533 F.3d at 1038 (internal quotation marks omitted). However, the Court will "review the ALJ's decision based [only] on the reasoning and factual findings offered by the ALJ." *Bray v. Comm'r of SSA*, 554 F.3d 1219, 1225 (9th Cir. 2009). The Court will not "attempt to intuit what the adjudicator may have been thinking." *Id*.

**II.    Facts**

**A.    Plaintiff Amy Sue Davidson**

Davidson is in her mid-40s. She is divorced, has no children, and currently lives with a friend. She has been unemployed since December 2006, when she was let go from a medical billing job because her alleged disabilities prevented her from fulfilling her work responsibilities. Before that, she had worked as a "dispatcher/CSR," "district manager," faculty assistant, marketing representative, restaurant manager, program analyst, IT troubleshooting specialist, and secretary. (Tr. 47.)

**B.    Davidson's Symptoms According to Her Treatment Records**

**1.    Pain**

*Pain from Fibromyalgia*. Since at least 2004, Davidson has seen a rheumatologist for fibromyalgia, mostly manifesting itself through joint pain on the left side of her body. Objectively, Davidson's rheumatologist repeatedly described Davidson as "well-appearing," and usually with "good range of motion" but "some tenderness" in various joints. The rheumatologist prescribed Lyrica in 2006, and Davidson returned on at least six occasions to discuss her progress and adjust her medication. Early on, Lyrica helped her to feel "60–70%" better, but eventually it only helped "somewhat" and she could not always afford it. (Tr. 384–97.)

*Pain from Reflex Sympathetic Dystrophy (RSD)*. In 1990, Davidson had an accident involving an 800-pound dumpster rolling over her right lower leg and foot. She continues

1 to suffer some amount of pain relating to this injury, which her doctors have diagnosed as
2 reflex sympathetic dystrophy (RSD), "a painful disorder that usu[ally] follows a localized
3 injury . . . marked by burning pain, swelling, and motor and sensory disturbances."
4 *Webster's New Explorer Medical Dictionary* 642 (Roger W. Pease, Jr. ed., new ed. 2006).
5 However, her podiatrist's records show that, despite "some" or "mild" pain in certain areas,
6 she can keep this condition under control through orthotics and proper footwear. (Tr.
7 494–97, 554.)

### 2. Depression

9 *Early Psychiatric Treatment*. Davidson experienced some traumatic incidents in her
10 childhood. She was physically abused by her brother, and sexually abused by one of her
11 brother's friends. When she was in her early 20s, she began the process of adopting a son
12 that her cousin did not want to take care of, and had the baby for about five months before
13 her cousin took him back. This incident, combined with a family history of depression,
14 eventually pushed Davidson to seek psychiatric help in the mid-1990s. Davidson saw that
15 psychiatrist (whom the record does not name) until the psychiatrist died in 2005. During that
16 time, the psychiatrist tried to treat Davidson's depression with Ativan, Prozac, Paxil, Zoloft,
17 and Lexapro. Each of these medications caused intolerable side effects. Davidson eventually
18 settled on a combination of Wellbutrin and Effexor. (Tr. 537–38.)

19 *Hospitalization*. After the first psychiatrist died in 2005, Davidson apparently did not
20 see another psychiatrist until June 2007, when Davidson checked herself into a mental health
21 hospital because she felt extremely depressed and no longer wanted to live. She eventually
22 concluded that the severity of this depressive episode resulted from the interaction between
23 Wellbutrin and Sinemet, a medicine recently prescribed to treat her periodic limb movement
24 disorder (discussed below). She stopped taking Sinemet, and the hospital substituted
25 Seroquel. Davidson was discharged after about a week. (Tr. 296–311, 384, 499.)

26 *Treatment by Dr. Fermo*. Davidson began seeing a new psychiatrist, Dr. Michael
27 Fermo, in late 2007. Davidson reported to Dr. Fermo that she was "somewhat functional"
28 with medications, but she would nonetheless get "very depressed" some days and could have

1  mood swings from day-to-day. She denied having irritability, racing thoughts, impulsivity,
2  flashbacks, nightmares, or anxiety problems. Dr. Fermo diagnosed "Major Depression
3  Recurrent in Partial Remission," and continued Davidson's Wellbutrin and Effexor
4  prescriptions. (Tr. 537–39.) Davidson returned to Dr. Fermo at least five times. Each time,
5  she reported mood fluctuations, including episodes of disabling depression lasting up to three
6  days at a time. For most of Davidson's visits, Dr. Fermo's treatment records describe
7  Davidson's mood as "depressed," her affect (*i.e.*, emotional tone) as "constricted," and her
8  concentration as either "poor" or "limited." Dr. Fermo also adjusted Davidson's medication
9  during most visits. (Tr. 656–57, 719–24, 801–22.)

### 3. Fatigue

11  *Fatigue from Periodic Limb Movement Disorder*. Beginning in about 2001, Davidson
12  began noticing that she would wake up in the morning feeling very tired. Davidson's then-
13  husband told her that her limbs would sometimes jerk violently while she slept. This
14  condition would come and go, but by 2006 it came frequently enough that Davidson sought
15  medical help. After an overnight sleep study confirmed these movements, a neurologist, Dr.
16  Shyamala Kumar, diagnosed periodic limb movement disorder. Davidson also reported
17  restless leg syndrome. All of this combined to make sleeping at night difficult for Davidson,
18  and she therefore felt very tired during the day. Dr. Kumar eventually referred Davidson to
19  another neurologist, Dr. Padma Mahant, who specializes in movement disorders. Between
20  2006 and 2009, Davidson made at least seven visits to Dr. Kumar and at least two visits to
21  Dr. Mahant. At each visit with either doctor, Davidson would report continuing fatigue and
22  varying degrees of responsiveness to (and side effects from) medication. Neither Dr. Kumar
23  nor Dr. Mahant commented regularly on Davidson's objective symptoms, but the few such
24  comments in the record range from "a very pleasant individual with no apparent distress" to
25  "frustrated and depressed affect." Both doctors would usually conclude each visit by
26  adjusting Davidson's medication. (Tr. 264–70, 408–17, 794–99.)

27  *Other Fatigue*. Davidson constantly reported poor nighttime sleep, daytime
28  drowsiness, and low energy to all of her physicians. Sometimes she attributed this to her

- 4 -

1 limb movement disorder, but at other times it seemed to be associated with depression, or a
2 side effect of medication.

### C. Practitioners' Opinions About Davidson's Ability to Work

Davidson applied for disability benefits in September 2007. During the application process, eight different doctors or psychologists — three treating practitioners, and five consulting practitioners — offered opinions on Davidson's conditions. All of the treating practitioners opined that Davidson was restricted from all regular work. Four of the consulting practitioners came to the opposite conclusion, and the fifth came to an essentially neutral conclusion. Each opinion is summarized below.

#### 1. Treating Practitioners

*Dr. Norley*. Dr. Julie Norley is Davidson's primary care physician. Davidson began going to Dr. Norley in December 2007, and has seen her on at least five occasions since then for various minor conditions as well as follow-up care regarding pain and depression. In two opinions submitted for disability proceedings, Dr. Norley reported that Davidson had "moderately severe" depression which "varies in frequency & duration." Dr. Norley also reported that Davidson was mildly to moderately impaired by the sedative qualities of some of her prescription drugs. Dr. Norley warned that if Davidson "does too much activity one day, this can lead to a prolonged recovery" and that Davidson's depression sometimes limited "her ability to concentrate and interact with others as well as adapt." Dr. Norley also opined that Davidson had certain physical restrictions, including that she could only "occasionally" engage in repetitive use of her hands. Dr. Norley ultimately concluded that Davidson could not work eight hours a day, five days a week on a regular and consistent basis. (Tr. 552–53, 584.)

*Dr. Fermo*. Davidson's psychiatrist, Dr. Fermo, opined that Davidson was (i) moderately impaired in her ability to relate to other people, respond appropriately to supervision, and perform simple tasks; (ii) moderately severely impaired in her ability to perform daily activities, maintain personal habits and interests, understand and carry out instructions, respond appropriately to coworkers, and perform complex, repetitive, or varied

1  tasks; and (iii) severely impaired in her ability to respond to customary work pressures.
2  Dr. Fermo reported drowsiness and dizziness as side effects of Davidson's medication, and
3  opined that her limitations would likely last for at least 12 months more. (Tr. 251–52.)

*Dr. Mahant*. Davidson's second neurologist, Dr. Mahant, reported that Davidson experienced moderately severe to severe drowsiness, fatigue, and pain from her limb movement disorder, depression, and fibromyalgia. Dr. Mahant concluded that Davidson could not work eight hours a day, five days a week on a regular basis. (Tr. 790–91.)

### 2. Consulting Practitioners

*Dr. Valeros*. Dr. Quirino Valeros, a general practice physician, met with Davidson once to evaluate her physical condition. Dr. Valeros noted nothing abnormal. "The patient is alert, oriented, and ambulatory without any difficulty. . . . She can move from the chair to the examining table without any difficulty." Dr. Valeros opined that Davidson had no functional restrictions. (Tr. 665–67.)

*Dr. DeFelice*. Dr. Donna DeFelice, a psychiatrist, met with Davidson once to evaluate her physical and mental limitations. Concerning Davidson's physical condition, Dr. DeFelice concluded that Davidson could handle a typical clerical job and needed no accommodations. Dr. DeFelice also opined that "objective findings do not support [the] severity of [physical] symptoms." Regarding Davidson's mental condition, Dr. DeFelice reported no significant limitations save for moderate limitations in Davidson's ability to maintain attention and concentrate for extended periods, and to complete a normal work day and work week without interruptions from psychologically-based symptoms. (Tr. 680–705.)

*Dr. Otto*. Dr. Steven J. Otto, a doctor of unknown specialty, reviewed Davidson's physical condition. It is not clear whether Dr. Otto actually met with Davidson, or whether he simply reviewed her medical records. Dr. Otto found no substantial physical limitations, and, like Dr. DeFelice, concluded that the severity of Davidson's reported pain was disproportionate to what could be expected from her physical illnesses. (Tr. 507–14.)

*Dr. Fair*. Dr. Stephen Fair, who appears to be a psychologist, offered an opinion about Davidson's mental condition. It is not clear whether Dr. Fair actually met with

1 Davidson, or whether he simply reviewed her medical records. He diagnosed Davidson with
2 moderate dysthymia (*i.e.*, moderate chronic depression) and opined that Davidson is
3 moderately limited in her ability to maintain attention and concentration for extended
4 periods; to perform activities within a schedule, maintain regular attendance, and be punctual
5 within customary tolerances; to complete a normal work day and work week without
6 interruptions from psychologically-based symptoms; to interact appropriately with the
7 general public; to accept instructions and respond appropriately to criticism from supervisors;
8 to get along with coworkers or peers without distracting them or exhibiting behavioral
9 extremes; and to set realistic goals or make plans independently of others. Dr. Fair ultimately
10 concluded that Davidson could sustain a 40-hour workweek. (Tr. 515–32.)

11 *Dr. Reyes.* Dr. Gary Reyes, a psychologist, examined Davidson for three hours,
12 apparently to determine whether Davidson was competent to manage disability benefits,
13 should they be awarded. Davidson reported to Dr. Reyes that she could do a number of
14 household tasks such as making her bed, preparing meals, laundry, and vacuuming, and that
15 she shopped for herself, managed her own finances, and was able to drive. "She stated that
16 her disability affects her daily living in that 'I miss a lot of stuff because I am in pain or I am
17 asleep.'" Dr. Reyes said of Davidson, "She was pleasant and established rapport easily," and
18 that she had average or above average mental abilities, as measured by certain psychological
19 tests. "She did not appear to present with emotional distress at the time of this assessment."
20 Dr. Reyes eventually concluded that Davidson could competently manage benefit payments.
21 (Tr. 669–77.)

### D. Davidson's Hearing Before the ALJ

23 At Davidson's ALJ hearing, the ALJ began by asking about her physical symptoms.
24 Davidson described her RSD and fibromyalgia, and explained that the "severe pain" from
25 those conditions (especially the fibromyalgia) is part of the reason that she stays home most
26 days. When she's at home, she must sit in a recliner or on her bed so that she can stretch out
27 her legs, somewhat reducing the fibromyalgia and RSD pain. Some weeks, she never leaves

1 the house, but she can drive, and she shops for herself every other week or so, although she
2 tries to combine shopping trips with other trips.  (Tr. 25–35.)

3       Davidson testified that Lyrica "diminishes the [fibromyalgia] pain some."  (Tr. 28.)
4 She also has a prescription for Vicodin, but she tries to avoid that because "it just makes me
5 sleepy and everything else I take makes me sleepy" and it "doesn't work on the Fibromyalgia
6 pain o[r] the bulk of the Fibromyalgia pain."  (Tr. 35.)

7       Concerning depression, Davidson affirmed that it was the "primary reason" that she
8 cannot work.  The ALJ, however, questioned Davidson about her visit to Dr. Reyes: "[H]e
9 thought your depression was mild at that time, any, any opinion?"  Davidson replied, "I
10 spoke to my psychiatrist about it, and what he said was that I probably presented that way
11 as mild because of the control that the, the two medications were giving me [*i.e.*, Effexor and
12 Wellbutrin]."  (Tr. 37.)

13       Davidson's attorney then questioned Davidson, eliciting testimony about the severity
14 of Davidson's symptoms.  Regarding her fatigue, Davidson stated that she needs to take
15 afternoon naps because her medications make her tired, and she also has trouble sleeping at
16 night because of pain and nightmares.  Regarding her depression, she cries for about two
17 hours at least once a week, and has feelings of guilt or worthlessness.  Davidson also testified
18 that she had difficulty with memory and concentration.

19       Following Davidson's testimony, the ALJ called Dr. George Bluth, a rehabilitation
20 psychologist and a vocational expert.  The ALJ posed hypotheticals to Dr. Bluth based on
21 Dr. DeFelice's opinions of Davidson's physical and mental capacity, and Dr. Bluth opined
22 that Davidson could still do almost all of the jobs she had done previously.  (*Compare* Tr.
23 47–48 *with id.* at 681, 688–89.)  The ALJ then posed a hypothetical based on Dr. Norley's
24 assessment of Davidson's physical capacity, including Dr. Norley's opinion that Davidson
25 could only engage in occasional repetitive hand motions.  In response, Dr. Bluth stated that
26 Davidson could no longer perform any of her past relevant work or any other work "because
27 if you envision light, unskilled work, it is going to involve more than just occasional use of
28 the hands."  (*Compare* Tr. 48–49 *with id.* at 552.)

The ALJ did not pose any hypotheticals to Dr. Bluth involving Davidson's alleged fatigue limitations, but the ALJ stated, "Counsel, I, I'd certainly take notice that, that Dr. Mah[a]nt's [opinion] of functional capacity is less than sedentary . . . and there'd be no work if I were to adopt Dr. Mah[a]nt's assessment." (Tr. 49.) Davidson's attorney subsequently posed hypotheticals to Dr. Bluth based on Dr. Fermo's opinions about Davidson's mental limitations. Dr. Bluth concluded that a person with limitations as described by those hypotheticals could not perform their past work or any other work. (*Compare* Tr. 50–51 *with id.* at 251–52.)

### E. The ALJ's Decision

The ALJ concluded that Davidson's fibromyalgia and RSD are "severe impairments" for purposes of Social Security, but Davidson's "medically determinable mental impairment of affective disorder does not cause more than minimal limitation in [her] ability to perform basic mental work activities and is therefore nonsevere." The ALJ supported this conclusion mostly by reference to Dr. Reyes's opinion, noting that Davidson, on the day of her evaluation with Dr. Reyes, did not exhibit any distress and demonstrated strong verbal and memory skills. Further, Dr. Reyes's "opinion was given greater weight," the ALJ said, "based on the objective nature of his exam and his consistency with the greater objective record." (Tr. 10–11.)

The ALJ also stated that his findings were consistent with Davidson's "own reported levels of functioning." The ALJ noted that Davidson can take care of herself, regularly keep medical appointments, drive, shop, and that she "occasionally goes out with friends." (Tr. 11.)

The ALJ found that Davidson's physical impairments did not add up to a listed disability, and he therefore went on to assess Davidson's residual functional capacity, which included being able to sit for six hours a day, stand and walk two hours a day, and unlimited fine and gross manipulation with no postural or environmental limitations. In reaching this assessment, the ALJ stated that he "considered all symptoms," including depression, anxiety, mood swings, chronic pain, and fatigue. The ALJ noted, "She naps several times a day due

to fatigue and sleepiness secondary to her pain medications and poor sleep at night.  She is also depressed about her overall condition and she lacks motivation."  The ALJ then found that Davidson's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Davidson's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (Tr. 12–13.)

The ALJ went on to explain the weight that he gave to the various doctors' opinions regarding Davidson's functional capacity.  The ALJ never mentioned Dr. Fermo's opinion, but he specifically noted that Dr. Mahant's opinion "was not given greater weight in this decision" because "[t]he objective record, including Dr. Mahant's own treatment notes fail to support" Dr. Mahant's opinions about Davidson's physical limitations.  For example, Dr. Mahant opined that Davidson should not drive automotive equipment as part of a job, but Davidson had driven herself to the appointment with Dr. Mahant.  The ALJ believed the latter fact undermined the credibility of the former opinion.  The ALJ also believed that Dr. Mahant's treatment notes evinced "normal findings in terms of motor functioning and neurological signs, as well as normal mental status."  (Tr. 13.)

The ALJ also discredited Dr. Norley's opinion, explaining (without elaboration) that it "was not given greater weight because the greater objective record does not show [Davidson's] limitations and restrictions preclude an 8-hour workday/40-hour workweek."  (Tr. 13–14.)

By contrast, the ALJ gave great weight to the opinion of Dr. Valeros.[1]  The ALJ noted Dr. Valeros's "[o]bjective findings includ[ing] normal gait, normal range of motion throughout all joints in the upper and lower extremities and spine, normal strength, and normal neurological signs. . . . [Davidson's] affect and mood were normal and appropriate,

---

[1]The ALJ actually refers to the opinion of "Dr. S. Heibult."  The name "Heibult" appears in the record at times, but never as an examining or consulting physician.  The exhibit the ALJ cites is the opinion of Dr. Valeros.  (Tr. 14.)  The Commissioner asserts that the reference to "Heibult" was simply a mix-up.  (Doc. 20 at 15 n.6.)

- 10 -

despite her assertion that she is disabled in part due to depression, anxiety and difficulty concentrating." The ALJ ultimately found Dr. Valeros's opinion more credible due to the "objective nature of his exam and his consistency with the greater objective record." (Tr. 14.)

The ALJ also generally endorsed all of "[t]he opinions of the State agency's reviewing physicians regarding [Davidson's] residual functional capacity . . . because their opinions were not inconsistent with the greater objective record, particularly regarding their finding that [Davidson possessed] the mental capacity to sustain an 8-hour day/40-hour workweek pace intact." (Tr. 14.)

"In sum," the ALJ concluded, "the above residual functional capacity assessment is supported by the greater objective record, particularly the findings of the state agency's examining and reviewing physicians, which are not inconsistent with the greater record." The ALJ found that Davidson could perform most of her past relevant work and therefore denied disability benefits. (Tr. 14–15.)

**III.  Analysis**

   **A.  Doctor Opinion Testimony**

Davidson argues that the ALJ, in reaching his residual functional capacity assessment, improperly discounted her treating physicians' opinions. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). In this case, the ALJ gave all the weight to the examining physicians, all of whom contradicted the treating physicians. The ALJ may do so only if he provided "specific and legitimate reasons supported by substantial evidence in the record." *Id.* (internal quotation marks omitted).

The ALJ satisfied this obligation. The ALJ repeatedly explained that the examining physicians' opinions received more weight because of their consistency with "the greater objective record" — which the Court takes to mean the "objective medical evidence," defined in the Social Security regulations to mean "medical signs and laboratory findings." 20 C.F.R. § 404.1529(a). "Signs" and "laboratory findings" are in turn defined:

> (b) Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from [a claimant's subjective] statements (symptoms). . . . Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.
>
> (c) Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests.

20 C.F.R. § 404.1528(b)–(c).

The ALJ's reference to the "greater objective record," along with the examples he offered from that record, legitimately and specifically explained why he rejected Davidson's treating physicians' opinions. The ALJ found that the objective medical signs and laboratory findings, both in the treating physicians' and consulting physicians' records, frequently showed things such as "good strength in the extremities," "normal gait," "relatively normal findings in terms of motor functioning and neurological signs, as well as normal mental status," and "affect and mood [that] were normal and appropriate." (Tr. 13–14.) The ALJ therefore specifically and legitimately gave more weight to the examining physicians' opinions. *See*, *e.g.*, *Tomassetti*, 533 F.3d at 1041 (ALJ gave specific and legitimate reasons for rejecting treating physician's opinion by explaining why it "'did not mesh with her objective data or history'").

Davidson nonetheless argues that the ALJ committed reversible error because the ALJ nowhere mentioned Dr. Fermo's opinion. Dr. Fermo, Davidson's treating psychiatrist, opined that Davidson's depression and related symptoms prevented her from working eight hours a day, five days a week. Without addressing Dr. Fermo's opinion, Davidson argues, the ALJ could not have reached a reasoned conclusion.

- 12 -

The Commissioner responds, "Although the ALJ did not specifically address Dr. Fermo's opinion, the ALJ's decision makes clear why he did not think that Plaintiff was limited to the degree Dr. Fermo suggested." (Doc. 20 at 22.) This argument encourages the Court to engage in after-the-fact justification for the ALJ's decision, which Ninth Circuit case law does not permit. *Bray*, 554 F.3d at 1225. But in any event, the Court finds that the ALJ's failure to address Dr. Fermo's opinion was harmless error. *See Tomassetti*, 533 F.3d at 1038 (no reversal where error is harmless).

Dr. Fermo added little to the "greater objective record" beyond his observations of Davidson's mood, affect, and concentration. He usually described her mood as "depressed," her affect as "constricted," and her concentration as "poor" or "limited." These observations do not change the fact that much of the objective medical evidence, as viewed by the ALJ, revealed that Davidson was an adequately functioning person. Although the evidence here "is susceptible to more than one rational interpretation," the ALJ's decision — even absent an analysis of Dr. Fermo's opinion — is supported by one such rational interpretation and this Court must therefore uphold it. *Orn*, 495 F.3d at 630.

### B. Subjective Symptom Testimony

Davidson argues that the ALJ improperly discredited her testimony about the intensity of her three main complaints — depression, pain, and fatigue. Each of these symptoms has an objective and a subjective component. Objectively, we can observe someone crying, wincing, or nodding off, and conclude that the person is depressed, in pain, or tired. But the Commissioner's interpretive rulings recognize that the intensity of these conditions is often purely subjective. "[I]ndividuals may experience their symptoms differently and may be limited by their symptoms to a greater or lesser extent than other individuals with the same medical impairments . . . ." Social Security Ruling (SSR) 96-7p, 1996 WL 374186, at *3.

Therefore, "a claimant who alleges disability based on subjective symptoms . . . need not produce objective medical evidence of the [symptom] itself, or the severity thereof." *Smolen v. Chater*, 80 F.3d 1273, 1281–82 (9th Cir. 1996). Instead, she must (a) "produce objective medical evidence of an impairment or impairments" and (b) "show that the

- 13 -

1  impairment or combination of impairments could reasonably be expected to (not that it did
2  in fact) produce some degree of [the subjective] symptom." *Id*. at 1282.  If the claimant
3  satisfies this test, then the Commissioner's rulings obligate the ALJ to evaluate the claimant's
4  credibility in light of

> the entire case record.  This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record.

9  SSR 96-7p, 1996 WL 374186, at *2.

10  If the ALJ concludes that the claimant's symptom testimony is not credible, the ALJ
11 must "make[] specific findings stating clear and convincing reasons for doing so.  The ALJ
12 must state specifically which symptom testimony is not credible and what facts in the record
13 lead to that conclusion." *Smolen*, 80 F.3d at 1284 (citation omitted).

14  The ALJ dispatched Davidson's subjective symptom testimony as follows: "the
15 claimant's medically determinable impairments could reasonably be expected to cause the
16 alleged symptoms; however, the claimant's statements concerning the intensity, persistence
17 and limiting effects of these symptoms are not credible to the extent they are inconsistent
18 with the above residual functional capacity assessment."  At first blush, this appears to say
19 no more than, "Her testimony is not credible because it conflicts with what I have already
20 decided." This, of course, would not be a reasoned conclusion, and Davidson argues as much
21 to this Court.

22  But in this case, the ALJ went on to explain his decision with the "specific, clear, and
23 convincing" reasons that case law and Social Security rulings require.  The ensuing two
24 pages of the ALJ's decision explain how he reached his residual functional capacity
25 assessment.  And in explaining that, the ALJ necessarily explained his credibility finding
26 because his residual functional capacity assessment turned on the very things he needed to
27 consider in deciding whether to credit Davidson's symptom testimony, specifically,

"information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual." SSR 96-7p, 1996 WL 374186, at *2.

The "information provided by treating or examining physicians or psychologists" comprised the "greater objective record" to which the ALJ frequently referred. As explained in the preceding section, this objective medical evidence rationally supports the ALJ's conclusion that Davidson can still function well enough to hold down substantial gainful employment. It therefore also supports a conclusion that Davidson's symptoms do not limit her as much as she claims.

Nonetheless, this is a close call. Regardless of what a claimant's doctors have to say, subjective symptoms are still subjective, and the Commissioner's rulings therefore encourage the ALJ to assess a claimant's credibility in light of the "longitudinal medical record," specifically whether it

> demonstrat[es] an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed . . . . Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.

SSR 96-7p, 1996 WL 374186, at *7.

Davidson fits this description well. However, the ALJ's explanation of how he reached his residual functional capacity assessment provides clear and convincing reasons for concluding that, although Davidson may suffer to some degree from the symptoms of which she complains, those symptoms do not eliminate her ability to perform all substantial gainful activity. Accordingly, the Court must uphold the ALJ's decision to discredit Davidson's subjective symptom testimony.

**IV.    Order**

- 15 -

IT IS THEREFORE ORDERED that the Clerk enter judgment affirming the final decision of the Commissioner of Social Security.  The Clerk will please close this case.

DATED this 9th day of December 2010.

/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE